count will be lowered, by an amount to be agreed to by the U.S. Attorney and Mr. Hotton. See letter from Akin Gump LLP, Exhibit A.

¶ 22. This objection is withdrawn.

¶ 23. This objection is withdrawn.

¶ 44. This objection is withdrawn as it is clarified in the objection above to ¶ 15.

¶ 62. This objection is withdrawn.

¶ 64 (e). This objection stands.

¶ 71. Hotton objects to Probation's denial of acceptance of responsibility points, as set forth below.

¶90. Hotton does not object to the first three paragraphs of this section.

However, we request that rest of ¶ 90, from the section starting with the sentence at the bottom of page 24, "Per information obtained from the Eastern District of New York Probation Office: Victim-Scheme Summary – U.S. v. Mark Hotton (12-cr-649)," to the middle of page 31, be removed in its entirety, as it is specific to the EDNY case, is reflected in the PSR for that case, and is not relevant here for sentencing determination.

¶ 94. This factual correction stands.

## LEGAL ARGUMENT ON GUIDELINE CALCULATIONS

1. Acceptance of Responsibility.

We disagree with Probation's determination that Mr. Hotton should not receive points for acceptance of responsibility. Mr. Hotton does qualify for the 3 point adjustment here because he accepted responsibility **for his offense**, and pled in a timely fashion, all as required by the relevant Guideline.

9

### The Guideline:

Guideline § 3E1.1, Acceptance of Responsibility, states:

(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense by 2 levels.
(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

### Commentary, Application Notes:

5. The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.

### The Issue on Acceptance of Responsibility:

At issue here is Mr. Hotton's alleged criminal conduct while on bail, and its impact on his acceptance of responsibility points. This guideline, however, focuses on the defendant's acceptance of responsibility "for his offense," not on his post - offense conduct.

What is the proper result when the alleged continued criminal conduct, while on release pending trial or sentence, is unrelated to the offense of conviction? It can be argued that § 3E1.1 is aimed only at the offense of conviction and thus unrelated criminal conduct is irrelevant. Hutchison, Hoffman, Young, Popko, Federal Sentencing Law and Practice, 1213, (2014 Ed.).

10

### The Case Law:

Certainly, in deciding this question, "an individual determination is required." United States v. Rodriguez, 928 F.2d 65, 67 (2d Cir. 1991). In Rodriguez, the Circuit vacated and remanded to give the District Judge a "full opportunity to exercise his discretion, in light of this opinion, as to whether to grant or withhold a reduction of acceptance of responsibility." Id. at 68. In that case, the District Court had denied the two-level downward adjustment for acceptance of responsibility as precluded by a three-level upward adjustment for committing an offense while released on bail in connection with a prior offense. While not on all fours with the facts here, the behavior on release of Rodriguez was worse than Mr. Hotton's bail violations, as Rodriguez' conduct resulted in a new charge. Both of Rodriguez' charges – old and new – related to cocaine violations. Id.

An instructive case is United States v. Harris, 13 F3d 555 (2d Cir. 1994). Harris was denied acceptance points by the District Court, and the Circuit affirmed that decision. But Harris' post arrest conduct was considerably more grievous than that of Mr. Hotton. "First, Harris violated the terms of his release by moving out of the YMCA without notifying the court, counsel or the U.S. Attorney. Second, his urine tested positive for morphine and codeine. Third, he failed to take advantage of opportunities for drug rehabilitation and counseling. These findings provided ample support for the district court's denial of a two level reduction for acceptance of responsibility under Sentencing Guidelines § 3E1.1." Id. at 557.

The Sixth Circuit held recently that "unrelated criminal activity cannot be the basis of refusing acceptance of responsibility." United States v. Howard, 2014 WL 2915884,*6. In that

case the defendant was denied acceptance points because he was found in possession of cell phones at the detention center where he was being held, once before pleading guilty and once after his plea. However, the Sixth Circuit did note that "the great weight of authority from other circuits is to the contrary" on this linking of denial of acceptance points to additional criminal conduct. Id.

In United States v. O'Neil, 936 F.2d 599 (1st Cir. 1991), the Honorable Stephen Breyer, then Chief Judge of the First Circuit, noted that the Guidelines explicitly state that a "defendant who enters a guilty plea is not entitled" to the credit for acceptance of responsibility "as a matter of right" (formerly § 3 E1.1(c), now Commentary, Application Note 3). O'Neil used marijuana and broke into a building while he was on bail awaiting trial for the offense to which he had pled guilty, and was denied the 2 level reduction at sentence. Although the sentencing court did not require or expect him to "accept responsibility" for his later conduct, it considered that conduct for the light that conduct shed on the authenticity of his claimed remorse for the crimes to which he had pleaded guilty. "We can find nothing unlawful about a court's looking to a defendant's later conduct in order to help the court decide whether the defendant is truly sorry for the crimes he is charged with. The fact that a defendant engages in later, undesirable, behavior does not necessarily prove that he is not sorry for an earlier offense; but it certainly could shed light on the sincerity of a defendant's claim of remorse." Id. at 599-600.

Discussion:

Many of Mr. Hotton's post release violations were for lesser violations. His bail conditions specified home detention with electronic monitoring, and included that he could only "leave for work, medical, legal or religious purpose on prior notice and permission of Pre-Trial."

According to the supervising pretrial officer, on numerous occasions Mr. Hotton made unpermitted stops at the supermarket, or to pick up his kids at school. On one occasion he went to or on the Fire Island Ferry to pick up his kids. On another, he made an unscheduled stop to donate blood. This donation is referenced in three letters written to your Honor by friends and family, see section below and Exhibits H,K,T.

However, other allegations regarding his failure to report changes in employment and an email he sent an employer who owed him money, the nature of which, Judge Seybert found, was threatening, were also advanced at the EDNY hearing on October 17, 2013. Judge Seybert found "clear and convincing evidence he not only violated the terms of his release but he will continue to do so." Transcript at 102. Mr. Hotton was remanded at the conclusion of that hearing.

Mr. Hotton's acceptance of responsibility for his charged crimes, to which he pled in a timely fashion, is not diminished by his post – trial conduct. He was punished for those post - plea violations, and he should not be denied acceptance of responsibility at sentence because of them. The language of the guideline, "If the defendant clearly demonstrates acceptance of responsibility for his offense," is narrow, and ties the acceptance of responsibility to the offense.

2. <u>The Court Should Honor the Plea Agreement.</u>

<u>The Case Law:</u>

The Second Circuit has recognized that "[t]he plea bargain is an indispensable tool for the administration of the criminal law." <u>United States v. Torres-Echavarria</u>, 129 F.3d 692, 695 (2d Cir. 1997); Mehler, Gleeson, and James, Federal Criminal Practice: A Second Circuit Handbook, §34-2, (14th Ed. 2014). The Second Circuit has "consistently endorsed the use of plea agreements as necessary to the operation of the courts within this Circuit." <u>Id.</u> at 695, citing <u>United States v. Cunavelis</u>, 969 F.2d 1419 (2d Cir. 1992); <u>United States v. Pimentel</u>, 932 F.2d 1029 (2d Cir. 1991) (discussing adverse impact on courts which would flow from disincentive to plea bargain). "Still, it is appropriate for a judge to scrutinize a deal struck by the prosecutor and defense counsel." <u>Torres-Echavarria</u> at 695.

In <u>Torres-Echavarria</u>, the defendant, referred to as "Torres," had re-entered the U.S. illegally about one year after a previous deportation for an aggravated drug felony. Torres was offered a plea to the lesser included offense of illegal entry, with a statutory maximum of 24 months as compared with the estimated 37 – 46 month Guidelines range for the offense of indictment, illegal re-entry by an alien who has previously been convicted of an aggravated felony. <u>Id.</u> at 694.

Torres' District Court Judge, John Gleeson, "acknowledged the deference normally accorded an agreement negotiated between competent counsel, the 'institutional incentives' that induce a prosecutor to plea bargain, and the observed phenomenon that the plea-bargaining process usually 'produce[s] the right result' in terms of the seriousness of the underlying crime,

but concluded nevertheless that Torres' case was the unusual one in which the proposed plea agreement does not satisfy the public interest." Id. at 694-695.

Discussion:

The facts of Torres' plea agreement are radically different than Hotton's. Torres pled to a lesser included offense, and the acceptance of his plea agreement, required the eventual (at sentence) dismissal of other counts. Hotton, in contrast, has pled guilty here to both Counts of his Indictment, and agreed to forfeiture and restitution. Thus the institutional incentives in favor of honoring Hotton's plea agreement clearly outweigh any public interest against doing so.

It is widely accepted that over 90% of federal cases are resolved by plea agreement. Thus, it is important for both parties, in specific and in general, that plea agreements be honored. For the defendant(s), knowing that the government will stand by the plea agreement is essential; for the government, holding the defendant to his commitments and concessions in the plea agreement, including acceptance of responsibility and waiver of appeal, is essential.

In our most recent conversation with the Government, after advising A.U.S.A. Diskant that Mr. Hotton would withdraw most of his extensive objections to the PSR, Mr. Diskant advised us that the government would stand by the plea agreement, including acceptance of responsibility.

As stated above, we are withdrawing our previous objections to the PSR, submitted by letters dated April 7 and July 1, 2014, and withdrawing or modifying many of those submitted by letter on March 21, 2014, as reflected above. Mr. Hotton withdraws these objections to eliminate

15

any question or concern that he has wavered in his acceptance of responsibility for his crimes. He has not and does not.

## 18 U.S.C. § 3553(a) FACTORS

### The Statute:

18 U.S.C. § 3553(a) states that district courts "impose a sentence sufficient, but not greater than necessary, to comply" with specified purposes of punishment.

A district court is also required to sentence a convicted defendant based in part on his or her history and personal characteristics. 18 U.S.C. § 3553 (a)(1); United States v. Perez-Frias, 636 F.3d 39, 43 (2d Cir. 2011).

18 U.S.C. § 3553 (a)(2) requires the sentencing court to consider, *inter alia,* specific and general deterrence and the kinds of sentences available.

The seven specific factors that § 3553(a) instructs district courts to consider are:
- the nature and circumstances of the offense and the history and characteristics of the defendant;
- the four general purposes of punishment;
- the kinds of sentences available;
- the applicable guideline range;
- any pertinent policy statement of the United States Sentencing Commission;
- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
- the need to provide restitution to victims.

18 U.S.C. § 3553(a)(1) – (7).

### Discussion:

1. Nature and circumstances of the offense:

### Count One:  Rebecca:

The actual amount of the fraud on this count is about $65,000, the total amount the producers of Rebecca paid or advanced to Mr. Hotton.

Mr. Hotton did in fact try to raise money for Rebecca, The Musical. This project failed in part, but not wholly because of Mr. Hotton's fraudulent conduct. For example, regarding the short term loans Mr. Hotton negotiated for Rebecca, one loan was negotiated but fell through when the Producer's home that was securing the loan turned out to be fully mortgaged and had no equity. Regarding a second loan for Rebecca, Hotton maintains that the investor he lined up backed out when he realized the production was being postponed. However, other investors Hotton put forward to the Producers were fictitious individuals made up by Hotton.

Rebecca had problems in other areas too, not just with Hotton's fraudulent conduct. The producers own funding sources were also falling short, and this too contributed to the inability of the project to move forward. The production was not so much abandoned as postponed. In fact, an article was published on Playbill.com on January 21, 2014 entitled "Additional Producers Enlisted to Bring Rebecca to Broadway; Musical Eyes Late 2014 Arrival." Although that article does refer to Mark Hotton and his fraudulent conduct regarding Rebecca, it also states "The producers continue to press their case against the show's former press representative Marc Thibodeau for breach of contract and defamation. Thibodeau withdrew his countersuit against the producers Jan. 17." See Exhibit C. Thibodeau is accused by the Producers of surreptitiously e – mailing investors and potential investors that the Rebecca producers had not raised the amount of money they claimed to have raised.

17

Count Two: Connecticut Real Estate deal:

Mr. Hotton did in fact produce some potential investors, as well as falsely representing that he had secured others, in his attempts to raise money for the President of the Connecticut Real Estate company. (That individual's name is not used here on agreement with the government). Some of these investors were discouraged by the failure of that company's President to document that he had $9.5 million in cash bank balances. Further, the President, through his attorney, has confirmed by letter that he is not seeking restitution in connection with the sentencing of Mr. Hotton. Exhibit A.

2. History and Characteristics of the Defendant:

Mark Hotton presents as an individual who committed multiple frauds, but also did much community service and good deeds. As illustrated by the many letters written in his support, he is an excellent father, husband and family man, loved by his children, wife, and relatives, and neighbors.

He has, according to the PSR, four prior interactions with law enforcement, all of which occurred during a 9 month period in 1990 when Mark was 24 years old. Three of these arrests were resolved with conditional discharge, and one with a misdemeanor conviction, all according to the PSR, ¶¶ 86 -89.

3. Disparity:

Fraud cases like this one are a common occurrence, so there are many sentences to view in relation to this one on the disparity issue.