Approved: _____
SARAH E. MCCALLUM/EDWARD B. DISKANT/ZACHARY FEINGOLD
Assistant United States Attorneys

Before:    HONORABLE RONALD L. ELLIS
           United States Magistrate Judge
           Southern District of New York        12 MAG 2686

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :    **AMENDED**
                                  :    **SEALED COMPLAINT**
       - v. -                     :
                                  :    Violations of
MARK HOTTON,                      :    18 U.S.C. § 1343
                                  :
           Defendant.             :    COUNTY OF OFFENSE:
                                  :    New York
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   THOMAS W. MCDONALD, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE
### (Wire Fraud)

   1.  From in or about January 2012, up to and including in or about September 2012, in the Southern District of New York and elsewhere, MARK HOTTON, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted and aid and abet the transmission, by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HOTTON defrauded the producers of a potential Broadway musical into paying him fees and other monies by falsely promising them financing for the musical.

   (Title 18, United States Code, Section 1343.)

## COUNT TWO
## (Wire Fraud)

2. From in or about September 2011, up to and including in or about October 2012, in the Southern District of New York and elsewhere, MARK HOTTON, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted and aid and abet the transmission, by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HOTTON defrauded a Connecticut-based real estate company into paying him and entities controlled by him over $750,000.

(Title 18, United States Code, Section 1343.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I have been personally involved in the investigation of this matter. This affidavit is based upon my investigation and my examination of documents and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. I have been a Special Agent with the FBI for approximately five years. I have received training regarding computer technology and white collar crimes.

### The Defendant

5. MARK HOTTON, the defendant, is a former stockbroker who resides in West Islip, New York. He has ties to numerous corporate entities, including entities that hold themselves out as electrical contracting companies and brokerage firms. HOTTON once worked for a prominent investment bank and financial services firm.

6. Based on my interviews with witnesses, I know that MARK HOTTON, the defendant, maintained an office at 100 Wall

Street, in New York, New York, and used a computer from that office, for at least part of 2012. The business name associated with that office is "Blackwell Capital Markets."

7. Also based on my interviews with witnesses and my review of documents obtained in this investigation, I know that MARK HOTTON, the defendant, from at least in or about September 2011 through at least in or about the beginning of October 2012, used a cellular telephone with a "917" area code (the "HOTTON Cell Number") -- a cellular area code for New York City -- to make false representations, orally and through text messages, in connection with both schemes described below. In fact, HOTTON used the HOTTON Cell Number as recently as October 11, 2012, to send a text message in furtherance of the second scheme described below.

8. Finally, based on my review of records concerning use by MARK HOTTON, the defendant, of the various e-mail accounts discussed herein, I know that he has logged into at least two of those accounts from his office at 100 Wall Street in New York, New York.

### Overview of the Schemes to Defraud

9. Since in or about late September 2012, I have been investigating allegations of fraud related to financing for a Broadway production of a musical called "Rebecca -- the Musical" ("Rebecca"), which is based on the novel by Daphne du Maurier. My investigation in this matter has included interviews with witnesses, review of e-mail correspondence and other documents seized pursuant to court-authorized search warrants, and review of telephone, bank, Internet access, and business records produced pursuant to grand jury subpoenas. Based on my investigation, and as set forth in greater detail below, I submit that there is probable cause to believe that MARK HOTTON, the defendant, committed fraud related to financing for Rebecca. Furthermore, during the course of my investigation, I discovered that HOTTON also committed a separate real estate fraud, using some of the same deceits he employed in order to perpetrate the Rebecca fraud. Based on my investigation, and as set forth in greater detail below, I submit that there is also probable cause to believe that HOTTON committed a separate real estate fraud.

*Overview of the "Rebecca" Scheme*

10. Over a period of approximately nine months, MARK HOTTON, the defendant, engaged in a series of elaborate deceits and subterfuges, repeatedly and falsely baiting Rebecca's producers into paying him in connection with his false assurances of additional financing for their musical. All told, by fabricating the existence of $4.5 million in commitments from overseas investors as well as the possibility of a $1.1 million loan, HOTTON preyed on the producers' need for financing and defrauded them into paying him and companies connected to him in excess of $60,000.

11. The financing that MARK HOTTON, the defendant, falsely promised to the producers of Rebecca took two forms:

    a. First, HOTTON falsely represented that he had secured commitments of approximately $4.5 million to Rebecca from several overseas investors (the "HOTTON Investors"). In truth and in fact, the HOTTON Investors appear to be HOTTON's own inventions. The businesses of some of these investors have websites whose domain names are registered to HOTTON and were created shortly before and during the fraud. The e-mail addresses for the overseas HOTTON Investors were, based on my investigation, controlled by HOTTON himself from the comfort of his home and office. Using the decoy e-mail addresses and other trappings he had devised, HOTTON fabricated e-mail correspondence between himself and the HOTTON Investors, and forwarded that correspondence to Rebecca's producers. Sometimes, he would have the HOTTON Investors correspond directly with the producers. HOTTON pretended to have traveled overseas to meet with and woo the HOTTON Investors. HOTTON even went so far as to orchestrate, through e-mail correspondence, the false illness and subsequent untimely "death" of one of the HOTTON Investors, namely, "Paul Abrams."

    b. By these deceptive means, HOTTON was able to extract payments for himself. Based on my review of bank records and other documents, and on my interviews of witnesses, I have learned that Rebecca's producers paid HOTTON at least $35,000 in "fees" and supposed expense reimbursements in the three months spanning March to June 2012, including $18,210.88 for a purported safari trip with "Paul Abrams."

    c. The second means of financing that HOTTON purported to secure for the Rebecca producers was a $1.1 million loan. Using a second set of apparently fictional characters and

4

entities tied to e-mail addresses actually controlled by HOTTON, HOTTON pretended to "broker" this loan for the producers, and even pretended to offer up his own real estate and brokerage account as collateral for the loan. In truth and in fact, there was no real loan or lender. HOTTON, again, simply used this fiction to generate payments to himself. During this phase of the fraudulent scheme, HOTTON caused Rebecca's producers to pay him $10,000 directly, and to pay entities that he and his associates controlled another $25,000.

12. On or about September 29, 2012, when it had become clear that neither of the funding sources purportedly secured by MARK HOTTON, the defendant, for Rebecca would materialize, the production of the musical was postponed indefinitely. By that time, the producers had spent at least $6 million of the funds committed by genuine investors and had incurred millions more dollars in debt related to the production.

*Overview of the Connecticut Real Estate Company Scheme*

13. Based on my investigation, there is further probable cause to believe that, at the same time he was conducting the Rebecca scheme, MARK HOTTON, the defendant, employed a similar set of deceptive devices, including the use of many of the same e-mail addresses and fictitious companies that were used to defraud the producers of Rebecca, to defraud another victim. Specifically, HOTTON pretended to help raise money for a real estate fund and then broker a $20 million loan for a Connecticut-based real estate company. In truth and in fact, HOTTON did not actually assist in raising money for the fund, nor did he assist in securing the loan. Instead, as he had done with the promised financing for Rebecca, HOTTON used these pretenses to extract "fees" and related costs -- this time totaling over $750,000 -- for himself and entities connected to him.

### The Rebecca Scheme:   The HOTTON Investors

14. As noted, my investigation has entailed, among other things, review of documents and correspondence obtained through search warrants and grand jury subpoenas. I have also interviewed the principal producers of Rebecca ("Producer-1" and "Producer-2"; together, the "Producers"), and other witnesses. Based on my review of documents and interviews with witnesses, I have learned the following about the budget and financing for Rebecca:

   a. The budget for Rebecca was to be between $12 and $14 million.  To raise money for the show, Rebecca's principal producers, through counsel, prepared a partnership offering.  The offering documents, which I have reviewed, designated as general partner a company jointly owned by the Producers (the "General Partner"), and all investors who contributed at a certain level as limited partners.

   b. The limited partners qualified as such upon execution of an Agreement of Limited Partnership with an entity called Rebecca Broadway Limited Partnership ("RBLP").  That agreement (the "RBLP Agreement") required any investor who signed it to make his or her or its funds available for immediate use by the General Partner.

   c. Investors were entitled to a full refund of their contributions in the event that RBLP failed to achieve minimum capitalization of $12 million by December 31, 2012.

   d. As of in or about late January 2012, RBLP was at least $4 million short of minimum capitalization.  A spring 2012 production of the show had been postponed indefinitely due to underfunding, the Producers were working to secure the capital needed to proceed, as well as a Broadway theater venue for a production sometime later in 2012.

  15. The investigation into this matter has revealed that, in or about January and February of 2012, MARK HOTTON, the defendant, represented to the Producers that he was capable of helping them achieve their financing goals.

  16. From speaking with Producer-2, I have learned that a third party suggested to her that she approach MARK HOTTON, the defendant, to gauge his interest in helping raise needed funds.  Producer-2 had never met HOTTON or heard of him, but placed a telephone call to him at the HOTTON Cell Number on or about January 18, 2012.  HOTTON, in e-mail communications and conversations that followed this initial contact, portrayed himself to the Producers as someone with substantial experience in raising funds for various endeavors.

  17. On or about February 7, 2012, the Producers caused RBLP to enter into an agreement with TM Consulting, Inc., a company controlled by MARK HOTTON, the defendant, and located at an address in West Islip, New York (the "HOTTON Business Address").  Under the agreement (the "HOTTON Agreement"), HOTTON undertook to raise money on behalf of RBLP in return for a fee

6

of $7,500, plus 8% of any funds raised in excess of $250,000, and tiered percentages of Rebecca's net profits.

18. From speaking with Producer-2, I have learned that the Producers paid MARK HOTTON, the defendant, his initial $7,500 fee and certain supposed expense reimbursements from the General Partner's account shortly after the HOTTON Agreement was executed.

19. I have reviewed bank records for an account in the name of the General Partner. From that review, I have learned that the General Partner paid MARK HOTTON, the defendant, a check of $5,901.15 on or about March 21, 2012, and wired him $7,000 on or about April 4, 2012. In addition, on or about June 14, 2012, the General Partner paid HOTTON another $5,000.

20. Throughout February 2012, and into early March 2012, MARK HOTTON, the defendant, and Producer-1 communicated by e-mail about HOTTON's purported successes in raising funds for RBLP. In one e-mail message, dated February 21, 2012, HOTTON stated, "I have soft circles on $3.18 mil."[1]

21. On or about March 5, 2012, Producer-1 e-mailed MARK HOTTON, the defendant, to say that he was meeting with a large investor in New York who had already committed funds and a theater space for Rebecca, and, at that meeting, "I must have everything with me regarding the capitalization target."

22. From speaking with Producer-1, I have learned that in or about early March 2012, MARK HOTTON, the defendant, provided Producer-1 with signed RBLP Agreements for the HOTTON Investors. Those documents, copies of which I have reviewed, bear dates in February and March 2012, and reflect the following investor and investment details:

    a. "Paul Abrams," of Hawthorne, East Victoria, Australia, with an e-mail address of miltonc@aol.com, committed to investing $2 million.

---

[1] The e-mail communications quoted throughout this Complaint are repeated herein as they appear in the originals, without alterations to correct grammatical or spelling errors. The e-mail messages were obtained through grand jury subpoena returns provided by both Producers and/or through search warrants.

   b. "Roger Thomas," of St. Peter Port, Guernsey, with an e-mail address of pbranson687@gmail.com, committed to investing $1 million.

   c. "Julian Spencer," of Crocker Hill, Chichester, Sussex, with an e-mail address of info@CPSEquity.com, committed to investing $1 million.

   d. "Walter Timmons," of London, United Kingdom, committed to investing $500,000.

  23. On or about April 26, 2012, MARK HOTTON, the defendant, sent Producer-1 a list of e-mail contact details for the HOTTON Investors. These details contradicted the information supplied for these same people mere weeks before. For example, HOTTON now attributed to "J. Spencer" the e-mail address pbranson687@gmail.com -- the address that, according to "Roger Thomas's" RBLP Agreement, belonged to "Roger Thomas." And "Paul Abrams" now had the e-mail address previously attributed to "Julian Spencer," info@CPSEquity.com. "R. Thomas," for his part, got a new address entirely: pthomas@mezzaninegroup1.com. Finally, "W. Timmens" (with this new spelling), according to HOTTON, was now using milton.c@aol.com, a variation on the account "Paul Abrams" had previously used.

  24. As part of my investigation, I have conducted domain registration database searches regarding the domains of the e-mail addresses that MARK HOTTON, the defendant, claimed belonged to certain investors, namely, (1) cpsequity.com, associated with info@cpsequity.com, the e-mail address first of "Julian Spencer" and then of "Paul Abrams," and (2) mezzaninegroup1.com, associated with pthomas@mezzaninegroup1.com, the e-mail address of "R. Thomas." I have also visited the websites www.cpsequity.com and www.mezzaninegroup1.com. From this research I have learned, among other things, the following:

   a. The domains cpsequity.com and mezzaninegroup1.com are registered through Web.com, Inc., a company headquartered in Jacksonville, Florida, and its affiliates (collectively, "Web.com"), which offer domain registrant masking services.

   b. The websites www.cpsequity.com and www.mezzaninegroup1.com bear striking similarities to one another. In fact, they both feature photographs of the same office building, albeit from different angles. The websites are both run through Web.com.

8

25. I have also reviewed documents and records provided by Web.com in response to a grand jury subpoena. Those documents and records reveal, among other things, the following:

  a. The domains cpsequity.com and mezzaninegroup1.com are both registered to "mark hotton" at the HOTTON Business Address and with the HOTTON Cell Number.

  b. The registrant of these domains engaged in electronic communications with representatives of Web.com to set up the domains and make periodic changes to his account. The initial Internet Protocol ("IP") address used by the registrant of these domains was a Verizon Wireless IP address.

  c. The domain cpsequity.com was established on October 18, 2011.

  d. The domain mezzaninegroup1.com was established on April 3, 2012.

26. I have reviewed records received from Verizon Wireless in response to a grand jury subpoena. From my review of those records I have learned that the IP address referenced in paragraph 25(b), *supra*, was assigned to the subscriber "Mark Hotton," at the HOTTON Business Address, at the time the Web.com registration discussed in paragraph 25, *supra*, was made.

27. In the same e-mail message of on or about April 26, 2012 referenced in paragraph 23, *supra*, MARK HOTTON, the defendant, demanded an "advance" against his 8% commission under the HOTTON Agreement of $18,210.88, reflecting costs he had purportedly incurred in treating HOTTON Investor "Paul Abrams" to a safari trip. HOTTON explained: "I will need Rebecca to advance against the costs that I just paid out for the Safari with Abrams, I paid for him and I as well as his oldest son."

28. From reviewing bank records for an account in the name of the General Partner, I have learned that, on or about May 3, 2012, Producer-2 signed a check to MARK HOTTON, the defendant, from the General Partner's account, for $18,210.88.

29. Also on or about April 26, 2012, Producer-1 wrote to "Paul Abrams" and the other HOTTON Investors, introducing himself and extending an invitation to a Rebecca event in May (the "Group Sales Event"). "Paul Abrams," using the e-mail account info@cpsequity.com, wrote back to Producer-1 on or about

9

April 27, 2012, with the following: "Mr. Hotton has spoken so highly about you. I received your invitation and Mr. Hotton and my assistant have been working all morning to switch our safari to next week so we can attend the event. I look forward to meeting you and if any further participation in the musical is attainable outside of what I'm doing personally, please let Mr. Hotton know so he can organize it thru my kids Trust."

    30. Then, on or about April 27, 2012, "Walter T.M.," using the e-mail account milton.c@aol.com, wrote the following to Producer-1: "Hi [Producer-1], Nice to meet you. I'm intrigued with your musical And look forward to its success. Mr Mark told Me to send the funds within 30 days, is that OK." Producer-1 responded that it was.

    31. As part of my investigation in this matter, I have subpoenaed records regarding the account milton.c@aol.com and have executed a search warrant on the contents of that account. As described in more detail below, the account appears to be controlled by MARK HOTTON, the defendant. The correspondence to and from the account relates almost exclusively to "deals" conducted by or with HOTTON. The supposed "users" of the account vary depending on the deal at issue: "Walter Timmons," "Milton Silverstein," "Jessica," "Allison Montgomery." Finally, based on documents I have reviewed from AOL and Time Warner Cable, Time Warner Cable maintains two of the recent IP addresses used to access the account, both IP addresses trace back to "Blackwell Capital Market," at 100 Wall Street -- a location at which Producer-1 visited HOTTON as recently as on or about September 28, 2012.

    32. From speaking with Producer-2, I know that, in or about the middle of May 2012, MARK HOTTON, the defendant, attended the Group Sales Event to which the HOTTON Investors had been invited. None of the HOTTON Investors personally attended, but HOTTON told Producer-2 that "Paul Abrams's" niece was in attendance, and pointed her out. When Producer-2 met this purported niece, she observed that the niece had an American accent.

    33. After the Group Sales Event, in late May and June 2012, Producer-1 received further e-mail communications directly from "Paul Abrams" at the e-mail address info@cpsequity.com.

## The Rebecca Scheme: The False Illness and "Death" of "Paul Abrams"

34. In early correspondence with the Producers, MARK HOTTON, the defendant, assured them that "Paul Abrams" would wire the funds he had promised by no later than July 31, 2012. As that date neared, the Producers sent increasingly urgent e-mail messages to HOTTON inquiring about the status of "Paul Abrams's" wire.

35. On or about July 23, 2012, in response to one such inquiry, MARK HOTTON, the defendant, wrote to Producer-2: "I spoke to his secretary, she said he was feeling under the weather, he was in Africa then went to Monaco for a day and landed and went home to bed, she will have him call first thing in the AM."

36. From in or about July 25, 2012 through in or about August 5, 2012, MARK HOTTON, the defendant, forwarded to the Producers various e-mail messages, all from milton.c@aol.com, the e-mail account that HOTTON had previously attributed to both "Walter Timmons" and "Paul Abrams." These messages in late July and early August, however, purported to have been sent from "Paul Abrams's" supposed "assistants," "Allison Montgomery" and "Jessica," and offered reports on "Paul Abrams's" declining health. "Allison Montgomery," for example, reported that "unfortunately while traveling Mr. Abrams has been infected with Malaria and is in ICU for a artemisinin-based combination therapy to treat the infection." A few days later, "Jessica, Mr. Abrams assistant," e-mailed to say that her boss was "holding his own, still in the ICU but OK."

37. The final e-mail message in this vein, dated on or about August 5, 2012, was from "Jessica" and read as follows: "Mr Hotton, I'm so sorry to relay such Terrible news, Mr. Abrams passed away this evening and the family has asked for your attendance at the services as well the opportunity to discuss their financial well-being, as you were so close to him. Please contact us tomorrow with your travel plans so we can arrange the family driver to pic k you up." The message that MARK HOTTON, the defendant, sent to the Producers in forwarding this report read: "I just got back from a fishing trip to see that I got This horrible news, I must secure a trip there tomorrow to take care of whats needed for us, I will call you in the AM."

38. On or about August 6, 2012, MARK HOTTON, the defendant, sent an e-mail message to Producer-2 reporting that

11

he was about to board a "flight from Newark" to "get it worked out."

### The Rebecca Scheme: "Wexler" and the Efforts to Collect Committed Funds

39. Throughout August 2012, MARK HOTTON, the defendant, sent e-mail messages to the Producers in which he reported on interactions he purportedly had had with, and communications he purportedly had received from, a man named "Wexler" who had been named executor of "Paul Abrams's" estate. HOTTON provided for "Wexler" the e-mail address wexler@silversteinpartners.com, and claimed to be meeting with "Wexler" in England in August 2012.

40. I have reviewed international air travel records maintained by the Department of Homeland Security for MARK HOTTON, the defendant. These records reflect that HOTTON has not left the United States since April 2012, at which time he traveled to London, England.

41. From my review of domain registration database records and records supplied by Web.com, I have learned that the domain msilversteinpartners.com was registered on August 15, 2012 to "mark hotton," at the HOTTON Business Address, and with the HOTTON Cell Number.

42. Throughout August 2012 and into September 2012, MARK HOTTON, the defendant, continued to forward to Producer-1 and Producer-2 communications he purportedly was having with "Wex," and "Wex" had occasional direct e-mail contact with Producer-1.

43. On or about August 28, 2012, Producer-1 sent an e-mail message to "Wexler" and the remaining HOTTON Investors, imploring them to wire the contributions that they and "Mr. Abrams" had committed. Producer-1 wrote that "[a]pproximately 6 million dollars has been spent to date on the production and there are outstanding substantial obligations to major vendors, the theatre owner, the advertising agency and others rendering services on behalf of the production, of approximately 8 million dollars, which is now due and owing or will become due in the next several weeks and into previews." Producer-1 noted that he expected "Wexler" to be present in Manhattan on August 30, 2012, "to finish up the Rebecca transaction on behalf of the late Paul Abrams," and further explained that unless the addressees contributed their promised funds by August 31, 2012, "the production may be unable to fulfill its obligations, and [RBLP] will be forced to abandon the production," with "a consequent

liability to investors and third parties of approximately 14 million dollars." Finally, Producer-1 noted that the addressees were the only investors who had yet to pay their promised funds.

### The Rebecca Scheme: The Short-Term Loan "Brokered" by HOTTON

44. From in or about the middle of August 2012 through in or about late September 2012, while MARK HOTTON, the defendant, was perpetuating the pretense that "Wexler" and the remaining HOTTON Investors might still come through with their funding commitments, HOTTON was also "brokering" a short-term loan to bridge Rebecca's budget gap pending the infusion of promised capital. This loan, originally planned for $1.7 million, and later proposed for $1.1 million, was to be secured in part through encumbrances on homes owned by the Producers.

45. On or about August 24, 2012, MARK HOTTON, the defendant, told the Producers that their bridge loan could be processed as soon as clear title on their homes had been declared. Two days later, HOTTON wrote to Producer-1 and Producer-2 that "the title group, Steve Wilson of Arbor services will contact you about the clearance of title his email is , swilson@arborservices.com." The next day, on or about August 27, 2012, "Mr. Wilson" wrote an e-mail message to Producer-1 from the account swilson@arborservicesms.com explaining that title clearance was likely to take some time.

46. From a search of domain registration database records, I have learned that the domain arborservicesms.com was registered on April 30, 2012 to "mark hotton" at the HOTTON Business Address, with the HOTTON Cell Number.

47. On or about September 11, 2012, MARK HOTTON, the defendant, forwarded the Producers a "final term sheet in the loan of $1,200,000.00." The term sheet purported to have been prepared by an entity called "SPS Equity LP." at 100 Park Avenue, 17th Floor, New York, New York. The borrowers were listed as Producer-1, Producer-2, HOTTON, and "Rebecca the Musical." The specified interest rate was 17%. An "origination fee" of $20,000 (the "SPS Equity Fee") was required to be wired under the terms of the loan to "Triumph Elec." at "1 Lawyers square, San Francisco, CA, 94105." The collateral for the loan was to include (1) a brokerage account held by Producer-2 at Morgan Stanley; (2) real property owned by Producer-2; (3) real property owned by Producer-1; and (3) a brokerage account purportedly held by HOTTON at the Royal Bank of Canada (the "HOTTON RBC Account"). The term sheet appeared to have been

13

prepared by "Robert Phillips, Executive Vice President, SPS Equity LP."

48. I have visited 100 Park Avenue. There is no business called "SPS Equity LP." located there.

49. On or about September 18, 2012, MARK HOTTON, the defendant, forwarded to the Producers another letter from "Robert Phillips" of "SPS Equity LP.," with the supposed e-mail contact "robert@spsequity.com." The e-mail address from which the letter was actually forwarded, however, was info@cpsequity.com -- the e-mail address that HOTTON himself had set up through Web.com and then ascribed first to "Paul Abrams" and then to "Julian Spencer." There is no domain by the name "spsequity.com." The letter demanded that the "third (3rd) tranche of the $20,000 origination fee in the amount of $5,000.00" be wired prior to processing of the loan.

50. On or about September 20, 2012, Producer-2 signed a final version of the above-described term sheet, with a revised collateral list and a final loan amount of $1.1 million. All payments under the loan were to be made to an account in the name of "Triumph Elec." at "Capital One Bank, 100 Park Avenue, NY, NY, 10017" -- the very address supplied for "SPS Equity LP."

51. From speaking with Producer-2, I have learned that, on or about September 20, 2012, MARK HOTTON, the defendant, told Producer-2 that, notwithstanding the signing of the final term sheet, the loan from "SPS Equity LP." would not go through unless more collateral was put up. HOTTON and Producer-2 then discussed the possibility that HOTTON would make more funds from the HOTTON RBC Account available as collateral for the loan.

52. On or about September 22, 2012, Producer-1 exchanged e-mail messages with a "Gus," who was using the e-mail address actnews@aol.com but held himself out as associated with "SPS Equity LP." The subject of the e-mail exchange was "SPS Equity LP.'s" purported need for further documentation before funding the short-term loan. The address supplied for "SPS Equity LP." in "Gus's" e-mail was not the one previously supplied -- 100 Park Avenue, 17th Floor, New York, NY -- but "633 West Fifth Street, Los Angeles, CA, 90057."

53. On or about September 24, 2012, Producer-1 and Producer-2 signed a letter agreement with MARK HOTTON, the defendant, awarding HOTTON a $20,000 "fee" (the "HOTTON Brokerage Account Fee") in exchange for HOTTON's agreement to

14

make more funds from the HOTTON RBC Account available as collateral for the bridge loan. The letter agreement provided that HOTTON would be entitled to $10,000 immediately upon signing of the agreement, and the other $10,000 when the bridge loan was actually funded.

54. On or about September 26, 2012, MARK HOTTON, the defendant, forwarded to Producer-2 an e-mail demand, purportedly made by "Al Vanti" of the Royal Bank of Canada, for an additional fee of $1,495 to be paid in connection with the increase of available collateral to be released from the HOTTON RBC Account. The e-mail address supplied for this "Al Vanti" in his signature block was different from the one listed in the header, by one letter. In the header of the e-mail, the address appeared as "Al.avanti@rbc.com." In the signature block, it appeared as "Al.Vanti@rbc.com."

55. Producer-2 has told me, in substance and in part, the following:

    a. In or about September 2012, she paid MARK HOTTON, the defendant, from her personal bank account $10,000 of the $20,000 HOTTON Brokerage Account Fee;

    b. In or about September 2012, Producer-2 caused RBLP to pay "Triumph Elec." the full amount of the $20,000 SPS Equity Fee, plus an additional $3,000 fee for purported legal services;

    c. In or about September 2012, Producer-2 paid $1,495 from her personal account to "Inter Continental Holdings and Management Inc.," the entity that HOTTON had told her was the Royal Bank of Canada's "commercial lending affiliate."

56. I have conducted a search of the New York Department of State database of corporate records. From that search I have learned that "Inter Continental Holdings and Management Inc." first filed its corporate documents with the New York Department of State on September 11, 2012. It has no registered agent listed.

57. I have spoken to an investigator at Capital Bank One N.A. ("Investigator-1"), an entity that was served with a grand jury subpoena in this investigation. From Investigator-1, I learned that the "Triumph Elec." account referenced in the term sheet from "SPS Equity LP." (the "Triumph Capital One Account") is controlled by three individuals, including the sister and

15

administrative assistant of MARK HOTTON, the defendant. Investigator-1 further told me that, based on his review of account records, $23,000 was wired into the Triumph Capital One Account between September 11, 2012 and September 26, 2012, by RBLP.

### The Connecticut Real Estate Loan Scheme

58. Based on my review of records and documents obtained by search warrants and grand jury subpoenas, I have learned that MARK HOTTON, the defendant, used many of the same e-mail addresses referenced above, and many of the same deceptive devices discussed above, to defraud a Connecticut real estate company (the "Real Estate Company") out of over $750,000 from in or about September 2011 through in or about October 2012.

59. Specifically, MARK HOTTON, the defendant, lured the Real Estate Company and its President (the "President") into paying hundreds of thousands of dollars in advance "fees" in connection with (1) raising funds for a real estate fund and (2) a $20 million real estate loan. HOTTON used many of the same deceits and fictional characters in this scheme that he had used in connection with the Rebecca scheme. For example, "Gus" the loan officer, this time allegedly associated with "CPS Equity" rather than "SPS Equity LP.," played a part in the Real Estate Company loan scheme. Similarly, many of the same e-mail addresses -- albeit ascribed to different people this time -- were used to the defraud the Real Estate Company: for example, pthomas@mezzaninegroup1.com (this time used by "Paul Thomas" rather than "R. Thomas"), and milton.c@aol.com (used now by "Milton Silverstein" instead of "Paul Abrams," "Walter Timmons," "Jessica," and/or "Allison Montgomery").

60. I have spoken with the President of the Real Estate Company, and from him have learned the following, in substance and in part:

    a. In or around September 2011, the President was introduced to MARK HOTTON, the defendant, by a business acquaintance. The acquaintance represented that HOTTON could help the President obtain financing for various business projects. In his communications with HOTTON, the President used the HOTTON Cell Number.

    b. HOTTON, in turn, told the President that a California-based group called "Pacific Ventures" could help the President obtain financing. According to HOTTON, "Milton

16

Silverstein," at milton.c@aol.com, was the appropriate contact at "Pacific Ventures." The President then exchanged numerous e-mail messages with "Milton Silverstein" and HOTTON regarding a potential loan.

        c.   Shortly thereafter, "Silverstein" and HOTTON informed the President that an affiliated company, "Mezzanine Capital," would come in to assist the Real Estate Company obtain financing. According to HOTTON, "Paul Thomas" was the appropriate contact at "Mezzanine Capital." HOTTON provided the President with pthomas@mezzaninegroup1.com as a contact e-mail address for Thomas.

        d.   In or around March 2012, with "Pacific Ventures" and "Mezzanine Capital" apparently unable to help the Real Estate Company obtain financing, HOTTON told the President that a third group, "CPS Equity" -- the company associated with two of the HOTTON Investors, "Paul Abrams" and "Julian Spencer," as well as with "Robert Phillips" of "SPS Equity LP.," in the Rebecca scheme -- would be able to process the loan on an expedited basis. HOTTON further told the President that "CPS Equity" would require a $200,000 upfront fee that would be fully refundable should the financing not come through. On or about March 16, 2012, the Real Estate Company wired $200,000 to an account specified by HOTTON. The account was in the name of "Trinity Management Consulting."

        e.   Following the initial $200,000 payment made in connection with this "CPS Equity" financing, HOTTON instructed the President to make additional payments totaling $101,685.43, including payments of $76,685.43 to an entity called "Clinical Response Solutions." The President did so.

        f.   In or around May 2012, having still not received financing, the President was instructed to start the loan application process anew with "Milton Silverstein" at Pacific Ventures. The President began communicating again via e-mail with "Milton Silverstein" at milton.c@aol.com.

        g.   Between May 2012 and October 2012, at the direction of HOTTON, "Milton Silverstein," and "Paul Thomas," the Real Estate Company wired in excess of $450,000 to various entities, including HOTTON himself and "Triumph Elec.," for various purposes, all ostensibly in support of the attempt to obtain financing.

17

61. As set forth in paragraph 31, supra, AOL and Time Warner Cable records reflecting use of the e-mail account milton.c@aol.com show that the account has been logged into, as recently as in August and September 2012, by the subscriber "Blackwell Capital Market" at 100 Wall Street, New York, New York -- the location that HOTTON was observed using as his office as recently as on or about September 28, 2012.

62. Based on my review of corporate records maintained by the New York Department of State, I have learned the following:

    a. The business address for "Trinity Management Consulting Corp." is the HOTTON Business Address.

    b. The entity "Clinical Response Solutions Incorporated" is registered in the name of the sister of MARK HOTTON, the defendant.

63. From speaking with Investigator-1, I have learned that the Triumph Capital One Account received wires from the Real Estate Company totaling over $340,000 from in or about May 2012 through in or about August 2012.

64. To date, the Real Estate Company has not received any of the funding that MARK HOTTON, the defendant, promised to arrange. As recently as October 11, 2012, HOTTON, using the HOTTON Cell Number, sent a text message to the President in connection with his scheme.

WHEREFORE, I respectfully request that an arrest warrant be issued for MARK HOTTON, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

THOMAS W. MCDONALD
Special Agent
Federal Bureau of Investigation

OCT 12 2012

Sworn to before me this
___ day of October 2012

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

RONALD L. ELLIS
United States Magistrate Judge
Southern District of New York

19