

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 19, 2018

BY ECF AND U.S. MAIL

The Honorable John G. Koeltl
United States District Court
Southern District of New York
New York, New York  10007

      Re:    United States v. Mark Hotton, 12 Cr. 825 (JGK)
                  Hotton v. United States, 18 Civ. 7717 (JGK)

Dear Judge Koeltl:

      The Government writes in response to a motion filed by petitioner-defendant Mark Hotton (the "defendant") on August 28, 2018 pursuant to Title 28, United States Code, Section 2255 (the "Petition"). In the Petition, the defendant contends that because one of the victims of the fraud schemes to which the defendant pled guilty in July 2013 was subsequently prosecuted for unrelated conduct more than four years later, his own guilt should be drawn into question. The claim, which is illogical and supported by nothing but the defendant's bare and conclusory assertions, is barred by the terms of the defendant's plea agreement and meritless.[1] It should therefore be denied.

    **A.  Background**

      By way of background, the defendant was charged in November 2012 by indictment 12 Cr. 825 (JGK) with two counts of wire fraud, in violation of Title 18, United States Code, Section 1343. The charges stem from the defendant's role in orchestrating two different fraud schemes, both of which followed the same general pattern – the defendant solicited thousands of dollars in up-front fees from victims who believed the defendant would assist them in raising much needed funding for their corporate endeavors. When no such funding materialized, the victims were not only short the up-front fees charged the defendant but they found themselves without funding they had been all but guaranteed and on which they had relied in developing corporate plans.

      The first scheme, which involved the producers of the contemplated Broadway musical Rebecca, is of no relevance to the instant Petition. With respect to the second, the defendant an elaborate and lucrative fraud scheme targeting what was described at the time as a Connecticut-based real estate company (the "Real Estate Company"). In this scheme, the defendant falsely represented that he had the ability to help obtain financing for various business ventures the Real Estate Company was interested in pursuing. The defendant then identified potential sources of

---

[1] As discussed further below, the Petition, which comes nearly four years after the defendant's conviction became final, is also almost certainly time barred.

funding for the Real Estate Company, all of which were entirely fabricated by the defendant. And finally, the defendant solicited tens of thousands of dollars in up-front fees and expenses from the president of the Real Estate Company, ostensibly in return for assistance in obtaining financing. No financing was ever obtained for the Real Estate Company, which was induced over the course of nearly one year to provide the defendant with hundreds of thousands of dollars. (*Id.* ¶ 62.)

In particular, and further detailed in both the Criminal Complaint and the PSR, in approximately September 2011, the defendant was put in contact with the president of the Real Estate Company, *i.e.* DiMenna, who was, at the time, was seeking financing for a series of corporate projects the Real Estate Company was then considering. The President of the Real Estate Company then met with the defendant who promised he could help and, in particular, identified contacts at several companies – "Pacific Ventures" and "Mezzanine Capital" – which the defendant represented would be able to help the Real Estate Company secure funding. In truth, there was no "Pacific Ventures" nor any "Mezzanine Capital." Both were pure fabrications, created by the defendant. However, the fabrications were elaborate, and as part of the scheme, the defendant also created fictitious employees at both companies, *i.e.*, "contacts" with whom the President of the Real Estate Company believed he was corresponding via e-mail addresses also provided by the defendant. None of these "contacts" existed, and, indeed, the employees identified by the defendant at both companies – a "Milton Silverstein" and a "Paul Thomas" – used some of the very same e-mail addresses ascribed to the foreign investors by the defendant in his dealings with the producers of Rebecca the Musical. (*Id.* ¶ 64.)

After using e-mails from the "contacts" described above to string along the President of the Real Estate Company for nearly six months, in March 2012, and with no financing forthcoming from either "Pacific Ventures" or "Mezzanine Capital," the defendant identified a third firm, "CPS Equity," which the defendant represented could help the Real Estate Company obtain financing. According to the defendant, CPS Equity would charge a "fully refundable" $200,000 up-front fee which the President of the Real Estate Company, having grown increasingly desperate to obtain financing, was willing to pay. (*Id.*) The defendant further instructed the President to wire more than $100,000 in additional fees to another company, "Clinical Response Solutions," which the President also did. (*Id.*)

No financing came through, however, so in May 2012, the defendant told the President of the Real Estate Company that they would have to circle back to "Pacific Ventures" and "Mezzanine Capital," both of which, the defendant represented, might now be able to help. Ostensibly toward that end, the defendant solicited hundreds of thousands of dollars in additional fees and "expenses." In particular, between May and October 2012, the defendant convinced the President of the Real Estate Company to transfer an additional $450,000 to accounts under the defendant's control, all for financing from companies and contacts that did not exist. (*Id.*)

In total, between September 2011 and October 2012, the defendant obtained more than $750,000 from the Real Estate Company, a significant portion of that under false and fraudulent pretenses. (*Id.*)

On July 13, 2013, the defendant plead guilty to both counts of the Indictment pursuant to an agreement with the Government. In that agreement, a copy of which is attached hereto, the defendant "acknowledge[d] that he has accepted this Agreement and decided to plead guilty

because he is in fact guilty." (Ex. A at 4.) He further agreed "not to file a direct appeal, *nor bring a collateral challenge*, including but not limited to an application under Title 28, United States Code, Section 2255." (*Id.*). He further agreed to "waive[] any and all right to withdraw his pleas or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, Jencks Act material, [or] exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963)." (*Id.*). Finally, and as part of the same, the defendant stipulated to a calculation of the U.S. Sentencing Guidelines applicable to his case, one that included an agreed upon total loss amount of more than $400,000 but less than $1,000,000. (*Id.* at 2.)

As a part of the plea proceeding, the defendant was specifically allocated on his understanding of the appellate waiver, including the defendant's waiver of his right to bring a collateral attack. (Tr. at 18.) During the same, the defendant also acknowledged his guilt with respect to the DiMenna scheme, acknowledging that he obtained money from DiMenna and the Connecticut based Real Estate Company through false representations made via the wires and that he knew what he was doing, with respect to DiMenna, was wrong and illegal. (*Id.* at 22.) On the basis of that allocution, the Court accepted the defendants' plea of guilty

On October 10, 2014, this Court sentenced the defendant principally to a term of 34 months. At sentencing, the defendant, through counsel, again conceded his role in defrauding DiMenna as part of Count Two. (*E.g.*, Tr. 11-12.) The judgment of conviction entered on October 17, 2014. The defendant filed no appeal, and the conviction therefore became final on or about November 2, 2014.

The defendant, who was charged and convicted separately in the Eastern District of New York, is still serving his sentence on those offenses.

### B. The Petition

On August 1, 2018 – or nearly four years after his conviction became final – the defendant commenced the instant action. Citing a September 11, 2017 press release announcing charges brought by the U.S. Attorney's Office in Connecticut against John DiMenna (the "Connecticut Charges"), the defendant contends this "newly discovered evidence" about the victim of one of the schemes to which the defendant pled guilty warrants relief. Specifically, the defendant contends, with scarce factual basis, that (1) the Government was aware, back in 2013 and 2014, that DiMenna was engaged in the criminal conduct giving rise to the Connecticut Charges; (2) the Government withheld that information from the defendant, and (3) the defendant's conviction for defrauding DiMenna is infirm as a result.

### C. Applicable Law

28 U.S.C. § 2255(a) permits a federal prisoner to "move the court which imposed the sentence to vacate, set aside or correct the sentence" on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." *Id.* The statute mandates that such claims be

brought within one year of "the date on which the conviction becomes final." 28 U.S.C. § 2255(f)(1).

Moreover, "[b]ecause collateral challenges are 'in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'" *Yick Man Mui* v. *United States*, 614 F.3d 50, 53 (2d Cir. 2010) (quoting *Ciak* v. *United States*, 59 F.3d 296, 301 (2d Cir. 1995)). To prevail on a collateral attack, a defendant must demonstrate "constitutional error . . . or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)).

**D. Discussion**

As an initial matter, every aspect of the Petition is barred by the terms of the defendant's plea agreement.[2] In his plea agreement, the defendant: (1) stipulated to the accuracy of the Guideline's calculation; (2) waived his right to bring a direct or collateral attack on his conviction; (3) specifically waived his right to collaterally attack his sentence on the basis of an alleged disclosure or discovery violation; (4) stipulated to the accuracy of the Guidelines calculation, including the loss amount, and (5) affirmed that he was pleading guilty to all counts of the Indictment "because he is in fact guilty." The defendant identifies no basis to conclude the binding appellate/collateral attack waiver should not be enforceable here, nor is the Government aware of any.

Moreover, even were the Court to look beyond the waiver which it should not, the defendant's arguments, which are based entirely on speculation, are baseless as a matter of fact and meritless as a matter of law. Prior to sentencing, the defendant served the victim, DiMenna, with a series of Rule 17 subpoenas calling for the production of bank records and other documents. DiMenna, through counsel, negotiated a resolution of those subpoenas directly with counsel for the defendant. (*E.g.*, Ex. B to Petition). Counsel for DiMenna theninformed the Government of the same and that DiMenna did not want to be publicly named and did not want to seek restitution, information the Government provided to the Court at sentencing.

More than three years after sentencing, on September 11, 2017, a different U.S. Attorney's Office announced unrelated charges into DiMenna stemming from conduct that does not appear to have anything to do with this case, *i.e.* the Connecticut Charges. Based on nothing but the fact of those charges, the defendant contends that back in 2014, when the Government relayed to the

---

[2] The Petition is also untimely because it was filed considerably more than one year after the defendant's conviction became final, on or about November 2, 2014. *See* 28 U.S.C. § 2255(f). The defendant suggests the fact of the charges brought by the U.S. Attorney's Office for the District of Connecticut, announced in September 2017, constitute "facts supporting the claim or claims" were discovered. *See* 28 U.S.C. § 2255(f)(4). Since there are multiple additional grounds for dismissing the Petition, the Government assumes for purposes of this filing only that any claims brought exclusively based on the September 2017 charges are timely. However, as noted below, to the extent the defendant seeks to assert claims based on information he claims to have provided to the U.S. Attorney's Office for the Eastern District of New York or otherwise was aware of back in 2013-20114, those claims are unquestionably time barred.

Court that DiMenna no longer was seeking restitution that the Government was somehow aware of the conduct giving rise to the Connecticut Charges and was "withholding" that information from the defendant and the Court. (Petition at 1.) That assertion, which is based on no factual support, is wrong. This Office had no role in that investigation, an investigation which as noted throughout, culminated in charges brought years after the relevant events in this case.

Moreover – and far more important – even assuming the Government was somehow aware back in 2013 and 2014 of the conduct giving rise to the Connecticut Charges, that would not in any way draw into question the defendant's guilt in this case. Indeed, the fact that the defendant's victim was himself engaged in defrauding others is neither a defense to the conduct charged in this case, nor a relevant fact in ascertaining the scope of the actual or intended loss caused by this defendant. And aside from the conclusory assertion that information about DiMenna's crimes would have resulted in in a lower Guidelines calculation, the defendant offers absolutely no explanation of how or why information about DiMenna's criminal conduct would have impacted this defendant's plea of guilty or his Guidelines range, a range to which, as noted above, the defendant stipulated as a part of his plea agreement.

For substantially the same reasons, any claim that the defendant's counsel was constitutionally defective by failing to raise a challenge to the Guidelines calculation – a calculation counsel was prohibited from challenging as a condition of the plea agreement – is baseless.

Finally, in his third claim, the defendant seeks to withdraw his plea of guilty to Count Two on the grounds that the Government allegedly "withheld" information about DiMenna's criminal conduct. As an initial matter, and for substantially the reasons set forth above, there is no factual basis for this claim.[3] Moreover, and far more important, the defendant again fails to identify, in anything but conclusory fashion, how the fact that DiMenna was apparently himself engaged in criminal conduct would have in any way lessened or diminished his own culpability. As detailed extensively above, there was an overwhelming factual predicate for the defendant's plea of guilty to the Connecticut Real Estate Scheme, including myriad false representations by the defendant, none of which would have been rendered true or non-criminal by the fact that DiMenna was apparently himself engaged in unrelated criminal conduct. The defendant's self-serving assertions to the contrary, nearly five years after his plea was entered, should be swiftly rejected.

---

[3] The Defendant suggests, in the context of his third ground for relief, that he was himself a victim of DiMenna's in what appears to be an unrelated scheme. He also suggests at various points that provided information about DiMenna to prosecutors for the Eastern District of New York with whom he proffered on a number of occasions. While the Government is not aware of a factual basis for those claims or the relevance of them in this context, even assuming those facts to be true, any claims based upon them are time barred, because unlike the fact of the prosecution brought by the U.S Attorney's Office in Connecticut which the defendant claims as newly discovered evidence, these facts were by the defendant's own admission known to him years ago. Similarly, any claim with respect to the defendant's efforts to cooperate with the U.S. Attorney's Office for the Eastern District of New York are not only time-barred but not properly addressed to this Court.

Accordingly, the Petition should be denied.

        Respectfully submitted,

        GEOFFREY S. BERMAN
        United States Attorney

By:   _/s/_____
       Edward B. Diskant
       Assistant United States Attorney
       (212) 637-2294

cc:    Mark Hotton